# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **GREGORY HAYNES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  3:20-cv-00086-GCS** |
| | ) | |
| **JOHN BALDWIN,** | ) | |
| **JACQUELINE LASHBROOK** | ) | |
| **FRANK LAWRENCE and** | ) | |
| **ANTHONY WILLS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

### INTRODUCTION AND BACKGROUND

Plaintiff Gregory Haynes, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated in Hill Correctional Center ("Hill"), brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while he was housed at Menard Correctional Center ("Menard"). In the Complaint, Plaintiff alleges Defendants denied him religious services, denied him a religious diet, and retaliated against him when he filed grievances about his access to religious services. He asserts claims under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). He seeks declaratory judgment, monetary damages, and injunctive relief.

The case is now before the Court on a motion for summary judgment filed by Defendants John Baldwin, Jaqueline Lashbrook, Frank Lawrence, and Anthony Wills. (Doc. 122, 139). Plaintiff filed an opposition. (Doc. 135).

On January 22, 2020, Plaintiff filed his Complaint and alleged that he is a practicing Muslim, and Defendants have been aware of his religious affiliation since entering the IDOC. (Doc. 1, p. 4). Plaintiff wanted to participate in Jumuah Friday services, but when he first arrived at Menard, he was prohibited from attending services because he was in segregation. *Id*. at p. 8. He was then told that he would be added to a waiting list because there were not enough seats in the chapel. *Id*. Defendant Lashbrook allowed Plaintiff to attend services, but only once there was an open seat available, and he was only allowed to attend one Friday per month instead of on a weekly basis as mandated by his religious beliefs. *Id*. at p. 8-9. Plaintiff was also unable to obtain a siwak (tooth stick for brushing teeth) and prayer oil, which is required before attendance at his religious services. *Id*. at p. 5.

Plaintiff wrote a grievance about the restrictions on his services, and Defendant Claycomb retaliated against him by removing him and other inmates from the Jumuah services list. (Doc. 1, p. 9). Services were regularly cancelled by Defendant Claycomb, and when Plaintiff asked for Islamic literature to supplement his services, Defendant Claycomb only provided Plaintiff with Christian literature. *Id*. at p. 9-10.

Menard also offers four basic menus: regular (which includes pork and pork by-products), vegetarian, kosher, and medical menu (which requires a doctor's prescription). (Doc. 1, p. 6). The prison does not offer a Halal menu for Muslims. The

alternative menus do not meet the dietary needs of Muslim inmates nor are they nutritionally adequate. *Id*. at p. 7. The kosher diet does have similar requirements to Islam for preparation of food to prevent the cross-contamination of foods. When Plaintiff submitted a request for a kosher diet, Defendant Claycomb subjected him to a written test to determine if his Islamic beliefs were sincere. *Id*. at p. 10. Defendants Claycomb and Lawrence then denied his request for a kosher diet. *Id*.

Plaintiff also alleges that Defendants Baldwin, Lashbrook, and Lawrence created and implemented policies and practices which substantially burdened his practice of religion including: hiring and retaining chaplains who failed to meet the requirements of RLUIPA, denying services due to overcrowding, adorning the chapel with Christian material while placing Islamic materials under lock and key, allowing funds for Christian celebrations but not Islamic feasts, denying Muslim inmates fellowship, denying prayer oil and siwaks, pressuring Muslim inmates to consume non-Halal meals, locking down the facilities during Ramadan and providing nutritionally inadequate meals, retaliating against inmates who file lawsuits about religious matters, depriving Muslim inmates of religious activities when they complain, selling food products in the commissary labeled Halal which are not fully reviewed for authenticity, and providing religious accommodations only after passing a test of sincerity. (Doc. 1, p. 14-15).

On March 16, 2023, the Court conducted the required review of Plaintiff's complaint pursuant to 28 U.S.C. § 1915A. (Doc. 8). The Screening Order allowed Plaintiff to proceed with the following counts:

Count 1:    James Claycomb and Jacqueline Lashbrook denied Plaintiff religious services in violation of the First Amendment and RLUIPA.

Count 2:    James Claycomb and Frank Lawrence denied Plaintiff a Halal diet in violation of the First Amendment and RLUIPA.

Count 3:    James Claycomb retaliated against Plaintiff in violation of the First Amendment in response to Plaintiff's grievances about his religious services.

Count 4:    John Baldwin, Jacqueline Lashbrook, and Frank Lawrence created policies and practices which burdened Plaintiff's practice of religion in violation of the First Amendment and RLUIPA.

Count 5:    State law negligence claims against James Claycomb, Jacqueline Lashbrook and Frank Lawrence.

(Doc. 8, p. 4, 6). The Court added Defendant Alex Jones, in his official capacity as Warden of Menard, to Counts 1, 2, and 4 for the purpose of implementing any injunctive relief awarded on Plaintiff's RLUIPA claims. *Id.*[1] On March 24, 2023, Defendant Claycomb was dismissed from this action because of his death. (Doc. 109). Thus, the remaining claims in this matter are Counts 1, 2, 4 and 5 concerning Defendants Lashbrook, Baldwin, Lawrence, and Wills (in his official capacity only).

Defendants contend that they are not personally liable for any alleged deprivations of Plaintiff's rights, and any alleged deprivation was justified by a compelling government interest due to the maximum-security correctional setting. Further, Defendants maintain that they are entitled to qualified immunity. Plaintiff counters that the evidence shows Defendants are personally responsible for the

---

[1]    As the current Warden of Menard, Anthony Wills is substituted for Defendant Jones pursuant to Federal Rule of Civil Procedure 25(d).

deprivations of his rights and that the deprivations were not justified by a compelling

government interest or by the least restrictive means.

UNDISPUTED MATERIAL FACTS

The following facts are taken from the record and presented in the light most

favorable to Plaintiff, the non-moving party, and all reasonable inferences are drawn in

his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

Plaintiff was incarcerated at Menard from January 2016 to March 2023.

Plaintiff identifies as a practicing Muslim since 2002. As a practicing Muslim it is

obligatory for Plaintiff to attend Jumuah Prayer every Friday. From June of 2016 to March

2020 there were approximately 180 Fridays. Jumuah is an Arabic word that translates to

congregation.

Defendant James Claycomb was the former Chaplain of Menard. Now deceased,

the Court dismissed Defendant Claycomb from this matter on March 24, 2023. As

Chaplain, Claycomb was responsible for setting policies and procedures regarding use

of the chapel and religious observance.

The chapel at Menard is used by all faiths. There is a morning chapel line for a

broad range of faiths and an afternoon chapel line for Christian and Protestant faiths.

Menard is a maximum-security prison and has a specialized set schedule for the

chapel, mental health lines, medical lines, yard, and meals. This allows the administration

to maintain safety and security of staff and individuals in custody. Specifically,

individuals are classified based on aggression level and may be housed in a specific cell

house as result. Pending no unforeseen circumstances, each cell house could come to the

chapel for Taaleem once a week during the morning chapel line, and each cell house could attend Jumuah one Friday per month. This schedule is created to allow one cell house access to the chapel at a time.

Prayer oils are flammable and can be heated and thrown.

Plaintiff requested a kosher diet because he knew that a Halal diet was not offered by the IDOC, and he believed that a kosher diet would comply with Halal requirements. Plaintiff believed it was appropriate for Muslims to eat a kosher diet because of the way the animal is slaughtered, *i.e.*, in the name of God. Defendant Claycomb denied Plaintiff's request for a kosher diet because he said there is no God's name professed over the animal when it is slaughtered.[2] Plaintiff did not request a vegetarian diet even though it would have complied with Halal requirements. Defendants agree that Plaintiff is entitled to a diet that accommodates his religious beliefs. Defendants admit that aside from the prayer, a kosher diet would be an option in addition to a lacto-ovo or a vegetarian diet. Further, Defendants admit that it would be reported if an individual made a purchase from the commissary that is not consistent with the requested diet. If an individual was on a regular diet, he could supplement from the commissary.

The Chief Administrator Officer ("CAO"), after consulting with the facility Chaplain, shall regulate the time, the place, and the way religious activities are conducted. The CAO may limit, restrict, discontinue, or deny a religious activity based

---

[2]     The reason for denying states: "Offender cites Quran requiring slaughtered food be offered up to 'God.' But Kosher has no blessing or . . . over it in any god's name. Approval of this diet request would violate the offender's stated justification." (Doc. 66).

upon concerns regarding safety, rehabilitation, institutional order, space, or resources. The CAO of each facility shall designate a Chaplain II as a senior Chaplain who shall prepare and submit a current schedule of all religious services and programs offered at the facility to the CAO for approval. The schedule shall contain the time, the date, the type, and the location of the activity. Any amendments to the schedule shall be submitted to the CAO for approval. The approved schedule shall be made accessible to the offenders.

Defendant Frank Lawrence, Assistant Warden of Programs, would defer to the Chaplain's religious expertise concerning the tenants of different faiths. Defendant Lawrence oversaw the grievance office and the chapel at Menard. Defendant Lawrence's signature is on Plaintiff's diet request dated February 20, 2019. However, there are initials after his signature. (Doc. 135-1, p. 66). Additionally, on December 17, 2019, Defendant Lawrence's office or his signatory approved the Grievance Officer response denying Plaintiff's grievance #433-2-19 regarding the dietary request as there are initials by his signature. *Id*. at 64.

Menard provided holiday meals for all individuals regardless of their religious beliefs.

Defendant Jacqueline Lashbrook served as the Warden/CAO of Menard. Plaintiff believes Defendant Lashbrook is responsible for deprivation of his rights because she oversaw policy as Warden. On March 3, 2017, Defendant Lashbrook or her signatory concurred with the Grievance Officer's decision to deny Plaintiff's grievance #51-2-17

dated February 16, 2017, regarding religious services as an administrative decision. (Doc. 135-1, p. 45-46).

Defendant John Baldwin was the Director of the IDOC. He was responsible for the supervision of the prisons. He was also responsible for the large-scale administration of the state agency while the wardens were responsible for the administration of their specific prison facilities. Plaintiff believes Defendant Baldwin is responsible because he supervised the prison as Director of the Department. On or about June 21, 2017, Defendant Baldwin or his signatory concurred with the Administrative Review Board's response to Plaintiff's grievance #51-2-17 dated February 16, 2017. (Doc. 135-1, p. 47; p. 56). Similarly, on April 3, 2019, Defendant Baldwin or his signatory concurred with the Administrative Review Board's response to Plaintiff's grievance #355-7-18 dated July 30, 2018. *Id*. at p. 51, 57.

Plaintiff was transferred from Menard to Hill on March 6, 2023.

Individuals may be transferred back to Menard.

Generally, individuals from different cell houses may be in the visiting and/or video areas at the same time. Individuals from separate cell houses find ways to pass information and/or contraband amongst each other.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV.

PROC. 56(a)). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, and as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## DISCUSSION

Both the Free Exercise Clause of the First Amendment and RLUIPA protect an inmate's right to practice his or her religion. Specifically, the Free Exercise Clause prohibits a prison from imposing a "substantial burden" on a "central religious belief or practice," unless the burden is reasonably related to a legitimate penological objective. *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). A legitimate penological objective includes safety, security, and economic concerns. *See Ruby v. Sevier*, No. 3:18-CV-890-JD-MGG, 2021 WL 736212, at *4 (N.D. Ind. Feb. 25, 2021) (citing *Turner v. Safley*, 482 U.S. 78, 89-91 (1987)).

RLUIPA imposes a higher standard and prohibits a prison from imposing a "substantial burden" on an inmate's religious exercise unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc–1(a)(1)–(2); *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). The court must afford great deference to prison officials regarding what constitutes a security risk in prison and how best to reduce that risk. *See, e.g.*, *Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005) (noting that courts "generally defer to the judgment of prison officials when they are evaluating what is necessary to preserve intuitional order and discipline[.]"). RLUIPA is to be applied "in an appropriately balanced way, with particular sensitivity to security concerns." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). Plaintiff bears the burden of demonstrating that the policy "substantially burdened [his] exercise of religion." *Holt v. Hobbs*, 574 U.S. 352, 361 (2015). The burden then switches to Defendants to show that the restrictions were "in furtherance of a compelling government interest" and were "the least restrictive means" to further that interest. *Id*. at 362.

Although money damages and injunctive relief are available under the First Amendment, only injunctive relief is available under RLUIPA. *See Ruby,* 2021 WL 736212 (N.D. Ind. Feb. 25, 2021) (citing *Sossamon v. Texas*, 563 U.S. 277, 285 (2011)); *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012).

As an initial matter, Defendants' motion for summary judgment will be granted as to the RLUIPA claims contained in Counts 1, 2 and 4, as Plaintiff is no longer housed in Menard and there is no indication in the record that Plaintiff could/will be transferred to Menard in the near future. When a prisoner's claim relates to events at a particular

prison, the general rule is that any request for prospective relief becomes moot if a prisoner is transferred because it is unlikely that the prisoner will be subjected to the same conditions again. *See Thompson v. Bukowski*, No. 18-3009, 812 Fed. Appx. 360, 2020 WL 2097278, at *2 (7th Cir. May 1, 2020); *Maddox v. Love*, 655 F.3d 709, 716–717 (7th Cir. 2011); *Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009). Injunctive claims will not be found moot, however, if the plaintiff can demonstrate a likelihood of being re-transferred back to the former institution. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996). Mere speculation of a re-transfer, however, is not sufficient to prevent a claim for injunctive relief from becoming moot. *Id.* An inmate must make a showing that it is a "realistic possibility" that he will be re-transferred to the prior institution. *See Maddox*, 655 F.3d at 716. Therefore, Plaintiff's claim under RLUIPA is moot.

To survive summary judgment on a First Amendment claim, the prisoner must raise a material question of fact regarding whether prison officials substantially burdened his religious practices. *See Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016); *Koger*, 523 F.3d at 796. The prisoner must also raise a material question of fact as to whether the burden on his religious practice was justified, meaning it furthered a legitimate and compelling state interest and was the least restrictive means available. *Thompson*, 809 F.3d at 379; *Koger*, 523 F.3d at 796. A substantial burden "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson*, 809 F.3d at 379 (citations omitted). *See also Koger*, 523 F.3d at 799 (stating that "a regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary,

and fundamental responsibility for rendering religious exercise . . . effectively impracticable.").

In a Section 1983 case, a defendant also cannot be held liable via the doctrine of *respondeat superior*. *See Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). To be held individually liable, a defendant must have personal responsibility for the violation of a constitutional right. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). The personal liability requirement of Section 1983 can be satisfied by showing that the constitutional deprivation occurred at an official's direction or with his knowledge and consent. *See Gentry v. Duckworth*, 65 F.3d. 555, 561 (7th Cir. 1995). In short, some causal connection or affirmative link between the action complained about and the official sued is necessary to recover under Section 1983. *Id*.

**Count 1 - Denial of Religious Services against Defendant Lashbrook**

Plaintiff alleges that his First Amendment rights were violated by a policy because he was only allowed to attend Jumuah once a month instead of every Friday.[3] The policy in question, that prisoners from separate cells houses are not allowed to mix due to safety and security concerns, allowed for only one cell house at a time to access the chapel for Jumuah services on rotating Fridays. Plaintiff claims that Defendant Lashbrook was aware of this policy as it applied to Plaintiff, that she signed off on the denial of Plaintiff's grievance regarding this issue and, thus, turned a blind eye. Defendants counter that

---

[3]     Also, in support of this claim, Plaintiff attaches affidavits that indicate other prisons accommodate Jumuah weekly. The Court finds this information is not relevant or material to this case as the policies and procedures are different and unique in each prison based on the circumstances at each prison.

Plaintiff has offered no evidence that Defendant Lashbrook was personally responsible for depriving Plaintiff of access to religious services. The Court agrees with Defendants.

First, Plaintiff has not established that Defendant Lashbrook was personally responsible for the denial of his religious services. In his deposition, Plaintiff admitted that he felt that Defendant Lashbrook was responsible because she was aware and oversaw the policies that only allowed him to attend Jumuah only once a month. (Doc. 122, p. 27-28).[4] This is not enough to establish personal liability. Furthermore, signing off on one grievance is not sufficient to establish that Defendant Lashbrook was personally

---

[4]      During Plaintiff's deposition the following colloquy occurred:

"Q. Why did you sue Lashbrook?
A. Just because she -- as the warden, she's responsible for the policies and protocols of Menard and the oversight of I.D.O.C. religious --
Q. Do you believe that she is personally responsible for denying you religious services, or is that only James Claycomb?
A. I believe personally denied me, no. Just she -- yes, because she -- yes, yes, yes, she is because she is aware of the policies of us not having Jumuah. She is in agreeance with this policy.
Q. So that's more of like a supervisory role in saying that policies are okay, but I guess what I am asking is: Do you believe that she personally participated in restricting those services or saying that you couldn't attend services as often as the Christians, or that James Claycomb?
A. That's just James Claycomb, I would say, with the not allowing Muslims to go but allowing Christians to go. I would say that's James Claycomb, but I would say not allowing us to have Jumuah every month, she is part of that.
Q. Yeah. That would be kind of what tied into Count 4 which would be -- which is John Baldwin, Jacqueline Lashbrook, Frank Lawrence, Greg Paul did the practices which burdened plaintiff's practice of religion in violation of the first amendment and RLUIPA, is that correct?
A. Yes.
Q. Is there anything else about Jacqueline Lashbrook which you believe is in issue in this lawsuit?
A. Just -- just -- that's it. That's it."

(Doc. 122, p. 27-28).

liable. *See, e.g.*, *Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017) (stating that "[p]rison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance."). Furthermore, "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation." *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). The record establishes that this claim regarding the denial of religious services is specific to conduct on the part of Claycomb and not to Defendant Lashbrook.

Moreover, the Court finds that the policy for attending chapel furthered a compelling government interest by the least restrictive means. There is no dispute that the IDOC has a compelling governmental interest in maintaining prison safety and security. The policy that prisoners from separate cell houses are not allowed to mix is due to safety and security concerns at Menard, which is a maximum-security prison. Further, this compelling interest is served by the least restrictive means by allowing one cell house at a time to access the chapel for weekly Taaleem services and access to once-a-month Friday Jumuah service. This policy/schedule allows for access to religious worship while ensuring that the prison remains safe and secure. Also, Plaintiff was not prohibited or limited from practicing his religion in his cell or in his cellhouse. In fact, Plaintiff admitted that he could practice his religion in his cell. Thus, the Court finds that summary judgment is proper on Count 1, denial of religious services claims.

**Count 2 - Denial of Halal diet against Defendant Lawrence**

"In the context of a religion's dietary requirements, a 'prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his

religious practice and adequate nutrition.'" *Taylor v. Cook Cty.*, No. 11 C 7427, 2013 WL 2285806, at * 7 (N.D. Ill. May 23, 2013). Correctional officials, however, are allowed to "appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005).

Here, the record reflects that Plaintiff has not established that Defendant Lawrence was personally liable regarding the denial of his dietary request as he was not the one who personally reviewed the dietary request.[5] In his deposition, Plaintiff stated he was suing Defendant Lawrence because was the warden that denied his dietary request. (Doc. 122, p. 28-29).[6] The record reflects that it was Chaplain Claycomb who indicated/found

---

[5]     In support of this claim, Plaintiff contends that individuals from separate cell houses "mix and mingle" in the visiting and/or video areas at the same time. The Court finds that this information is not material and does not support Plaintiff's claim regarding the denial of religious services.

[6]     During Plaintiff's deposition the following discussion took place:

"Q. Is he the warden that you wrote whenever you were taken off the list?
A. Yes. He is also the warden that was in compliance with me not being able to get the kosher diet.
Q. … So he was -- he was responsible for not getting you the halal diet?
A. Kosher diet, yes.
Q. And how are you -- how do you know he was aware of that process?
A. He signed off on it.
Q. Okay. Do you know if he, for instance, if the -- if the -- Mr. Claycomb says, you know what he said in response to your halal -- or your kosher diet that it didn't follow the tenets as no animals were slaughtered under God's name, do you know if Frank Lawrence would have the personal knowledge to know whether that was a correct or incorrect statement?
A. Well, he signed off on it. He should have -- I believe that since he signed his name, he should have known whether it's correct or not.
Q. And you don't think it is fair for him to just rely on the chaplain's knowledge and belief about what his decision-making process was?
A. No, he shouldn't.
Q. He shouldn't do that, okay. Is there anything else that Mr. Lawrence did; for instance, how did he -- did he create any policies or practices that burdened your religious practice?

that the requisite prayers were not said and that the kosher diet would not comply with the tenets of Plaintiff's religion as he requested due to the mention of specific prayers. (Doc. 135-1, p. 66).  Moreover, as stated *supra*, signing off on one grievance/denial of diet request does not constitute personal liability under Section 1983. Thus, Defendant Lawrence could not be personally liable for denying the dietary request.

Furthermore, the record reflects that Plaintiff did not ask for a Halal diet when he arrived at Menard and that he instead asked for a kosher diet believing it would comply with the requirements of his religion. *See* Doc. 122, p. 23.[7] Plaintiff admitted in his deposition that he did not ask for a vegetarian diet after he was denied the kosher diet. (Doc. 122, p. 24). Specifically, when asked if he could have requested a vegetarian diet, Plaintiff stated: "[w]ell, the vegetarian diet really doesn't -- it's all right for a Muslim to be vegetarian, but that I'm all right to eat meat. So I would rather eat the kosher diet. . . . [T]he vegetarian diet doesn't really fulfill my religious diet." *Id*. Further, Plaintiff testified that was trying to follow Prophet Muhammad who ate meat and vegetables. *Id*. Clearly, there is no evidence, and no reasonable fact finder could conclude that Plaintiff was

---

A. Well, I would just say he had -- the warden of operations I know he is familiar with how Jumuah and everything is ran. So he is aware of the practices and procedures."

(Doc. 122, p. 28-29).

[7]     Plaintiff did not ask for a Halal diet because he knew Menard did not have one. (Doc. 122, p. 24).

forced to chose between his religious practice and adequate nutrition. For these reasons, the Court **GRANTS** the motion for summary judgment on Count 2, religious diet.

**Count 4 - Policies and Practices against Baldwin, Lashbrook and Lawrence**

In his Complaint, Plaintiff alleges that Defendants Baldwin, Lashbrook, and Lawrence ratified, implemented, and pursued policies and practices that substantially burned his practice of religion, such practices included the following:

- hiring and retaining chaplains who fail to meet the requirements of RLUIPA;
- denying services due to overcrowding;
- adorning the chapel with Christian material while placing Islamic materials under lock and key;
- allowing funds for Christian celebrations but not Islamic feasts;
- denying Muslin inmates fellowship; denying prayer oil and siwaks;
- pressuring Muslim inmates to consume non-Halal meals and locking down facilities during Ramadan;
- providing nutritionally inadequate meals;
- retaliating against inmates who file lawsuits about religious matters;
- depriving Muslim inmates of religious activities when they complain;
- selling food products in the commissary labeled Halal which are not fully reviewed for authenticity; and
- providing religious accommodations only after passing a test of sincerity.

(Doc. 1, p. 14-15).

Defendants argue that Plaintiff failed to provide any evidence to support this claim. He has not demonstrated that any of the alleged conduct which he claims violated his constitutional rights occurred at the direction of Defendants Baldwin, Lashbrook, or Lawrence or that they were personally involved in the violation of his constitutional

rights. Neither has he presented evidence directly connecting Defendants to the alleged policies.

The Court finds that Defendants are entitled to summary judgment as to Count 4. In his deposition, Plaintiff stated he was suing Defendant Lashbrook because she oversaw policy as Warden and that he was suing Defendant Baldwin because he supervised the prison as Director. (Doc. 122, p. 27-28).[8] When asked why he was suing Defendant Lawrence, Plaintiff stated that he approved the denial of the religious diet. *Id.* at. p. 28-

---

[8]    Following is the questioning as to the Plaintiff's claim Defendant Baldwin:

    Q. Who is John Baldwin?
    A. John Baldwin was the -- Baldwin was the director at that time.
    Q. Okay. And why did you sue Baldwin?
    A. Because of the same -- for the same purposes as I stated in Count 4, him being a -- he is responsible for the I.D.O.C. policies and protocols, pertaining to procedures, yes.
    Q. And how do you know that John Baldwin was personally aware of Menard's religious rules and regulations?
    A. It's his job.
    Q. It's his job to know every single aspect of every prison's rules and regulations on how to operate everything?
    A. Yes.
    Q. Okay, and you believe that's a fair summary of what his responsibilities would be? To me, it just seems like a lot of knowledge for one person to have to have, especially as the director of I.D.O.C. who is typically handling more big picture issues, and he might delegate that stuff to other persons.
    A. Yes, but he's -- how can I put this? Yes, but even if he delegates to these people, they are under him. So they supposed to -- I would believe they would -- they still have to give to him -- it is similar to, let me see, like the mayor is above cops. If the cops do something wrong, they should get to the mayor, and the mayor is supposed to be able to fix it. I would say the same for the director.
    Q. Okay. So is it fair -- is that a fair summary of what you are saying is because he's in a supervisory position, he is responsible for his subordinate's actions?
    Q. He is responsible -- responsible for the policies and the procedures that goes on in the prisons that he is the director of."

(Doc. 122, p. 27-28).

29. Other than these statements, there is no evidence in the record connecting Defendants to any of the policies mentioned in the Complaint. An individual cannot be held liable under Section 1983 merely based on their supervisory role under the theory of *respondeat superior* or vicarious liability. *See, e.g.*, *Lemmon v. City of Carmel, Indiana*, 865 F.3d 503, 507-508 (7th Cir. 2017) (stating that "there is no vicarious liability in a suit under section 1983."); *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (stating that "there is no theory of respondeat superior for constitutional torts.") (citation omitted). As such, the Court **GRANTS** the motion for summary judgment as to Count 4, practices and policies claim.

**Count 5 – State Law Negligence against Lashbrook and Lawrence**

To succeed in a claim for negligence, a plaintiff must establish the existence of a duty, a breach of the duty, and an injury to the plaintiff that was proximately caused by the breach. *See Vancura v. Katris*, 238 Ill.2d 352, 373 (Ill. 2010) (citing *Hills v. Bridgeview Little League Ass'n,* 253 Ill. Dec. 632 (Ill. 2000)). As discussed *supra*, the Court finds that Plaintiff did not establish violations of his First Amendment rights and that Plaintiff has not offered any evidence that Defendants Lashbrook and Lawrence violated any duty owed to him or that he suffered an injury because of the alleged breach. Thus, the Court **GRANTS** summary judgment on Count 5, state law negligence claim.

CONCLUSION

Accordingly, the Court **GRANTS** the motion for summary judgment. (Doc. 122). The Court **FINDS** in favor of Defendants Jacqueline Lashbrook and Anthony Wills and against Plaintiff Gregory Haynes on Count 1, in favor of Defendants Frank Lawrence and Anthony Wills and against Plaintiff Gregory Haynes on Count 2, in favor of Defendants

Jacqueline Lashbrook, Frank Lawrence, John Baldwin and Anthony Wills and against Plaintiff Gregory Haynes on Count 4, and in favor of Defendants Jacqueline Lashbrook and Frank Lawrence and against Plaintiff Gregory Haynes on Count 5. Further, the Court **DIRECTS** the Clerk of the Court to enter judgment reflecting the same and close the case.

In an abundance of caution, and noting Plaintiff's *pro se* status, the Court advises Plaintiff as follows. Plaintiff has two means of contesting this order: (1) he may request this Court review this order; or (2) he may appeal the order to the Seventh Circuit Court of Appeals.

If Plaintiff chooses to request this Court to review this order, he should file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). Plaintiff *must* file the motion within twenty-eight (28) days of the entry of judgment; the deadline *cannot* be extended. *See* FED. R. CIV. PROC. 59(e); 6(b)(2). The motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *See Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010); *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) (stating that a party must establish either manifest error of law or fact, or that newly discovered evidence precluded entry of judgment to prevail on a Rule 59(e) motion) (citation and internal quotation marks omitted).

So long as the Rule 59(e) motion is in proper form and timely submitted, the 30-day clock for filing a notice of appeal will be tolled. *See* FED. R. APP. PROC. 4(a)(4). The

clock will start anew once the undersigned rules on the Rule 59(e) motion. *See* FED. R. APP. PROC. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). However, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not toll the time for filing a notice of appeal; it will expire 30 days from the entry of judgment. *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Martinez v. Trainor,* 556 F.2d 818, 819–820 (7th Cir. 1977). Again, this deadline can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.

In contrast, if Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal from the entry of judgment or order appealed from *within 30 days*. *See* FED. R. APP. PROC. 4(a)(1)(A) (emphasis added). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. *See* FED. R. APP. PROC. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 424 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard).

Plaintiff may appeal to the Seventh Circuit by filing a notice of appeal in this Court. *See* FED. R. APP. PROC. 3(a). The current cost of filing an appeal with the Seventh Circuit is $605.00. The filing fee is due at the time the notice of appeal is filed. *See* FED. R. APP. PROC. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a motion for leave to appeal *in forma pauperis* ("IFP motion"). *See* FED. R. APP. PROC. 24(a)(1). The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R. APP. PROC. 24(a)(1)(C). If Plaintiff is allowed to proceed *in forma pauperis* on appeal, he

will be assessed an initial partial filing fee. *See* 28 U.S.C. § 1915(b)(1). He will then be required to make monthly payments until the entire filing fee is paid. *See* 28 U.S.C. § 1915(b)(2).

IT IS SO ORDERED.

DATED:  March 12, 2024.

Digitally signed by Judge Sison
Date: 2024.03.12 14:37:45 -05'00'

GILBERT C. SISON
United States Magistrate Judge